**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LETITIA TUGGLE, an individual; LETITIA TUGGLE as REPRESENTATIVE OF THE ESTATE OF QUINNTIN CASTRO; ROSA CUEVAS, an individual; CAMERON WARE, an individual, | Case No. 1:19-cv-01525-JLT-SAB |
| Plaintiffs, | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFFS TUGGLE, ESTATE OF QUINNTIN CASTRO, CUEVAS AND WARE; ORDER DENYING AS MOOT PLAINTIFF CUEVAS'S MOTION FOR SUMMARY JUDGMENT AGAINST THE COUNTERCLAIMS; ORDER DISMISSING WITHOUT PREJUDICE ALL STATE LAW CLAIMS AND COUNTERCLAIMS |
| v. | |
| CITY OF TULARE; MATT MACHADO; RYAN GARCIA; ANDY GARCIA; EDWARD PUENTE; DANIEL BRADLEY; DOES 1-20, | |
| Defendants. | |
| CITY OF TULARE; RYAN GARCIA, | (Doc. 72, 73, 74) |
| Counter-Claimants, | |
| v. | |
| LETITIA TUGGLE, as REPRESENTATIVE OF THE ESTATE OF QUINNTIN CASTRO; ROSA CUEVAS; CAMERON WARE, ROES 105, | |
| Counter-Defendants. | |

The events of this case are tragic. In this civil rights action, the shootout that ensued after a high-speed chase, resulted in the death of the driver, the death of a police K9, the permanent disability of one passenger and a career-ending injury of a police officer. At issue before the

1

1   Court are cross-motions for summary judgment. (Doc. 72; Doc. 73; Doc. 74). As set forth below,

2   Defendants' motions for summary judgment against Plaintiffs' claims (Doc. 72; Doc. 73) are

3   **GRANTED**. The Court declines to exercise supplemental jurisdiction of the state law claims and

4   counterclaims, and therefore, Cuevas's motion for summary judgment against the counterclaims

5   (Doc. 74) is **DENIED as moot**.

## I.   BACKGROUND

7   **A.    Factual Background**

8       On December 9, 2018, Rosa Cuevas drove Quinntin Castro to a house on O Street in

9   Tulare, California, in her Mercury sedan. [1] (Doc. 85-2 at 33-34, ¶¶ 2-3.) Cuevas met Castro

10  approximately two weeks before, and they were getting to know each other. (*Id.*) Cuevas was new

11  to Tulare, single, and interested in making new friends. (*Id.*) After Cuevas dropped Castro off at a

12  house on O Street, she ran some errands. (*Id.*) Cuevas noticed Castro left his backpack in the car,

13  and she placed it in her trunk for safekeeping without opening it.[2] (Doc. 87-1 at 4, ¶ 5.) At

14  approximately 7:00 p.m., Cuevas returned to pick up Castro, and Cameron Ware was with him.

15  (*Id.* at 4-5, ¶¶ 5-9.) Cuevas agreed to give Ware a ride at Castro's request, but she asked Castro to

16  drive because she was unfamiliar with the area. (*Id.*)

17      Tulare Police Department Officer Bradley observed Castro roll through a stop sign, which

18  is a minor traffic violation. (Doc. 85-2 at 34, ¶ 5.) Officer Bradley did not pull Castro over

19  because rolling through a stop sign is a common occurrence and this conduct did not raise Officer

20  Bradley's suspicion. (*Id.* at 34, ¶ 6.) However, when Bradley observed Castro take a sharp left

21  turn without using a blinker and roll through another stop sign, Bradley decided to follow and

22  contacted dispatch, who confirmed the vehicle was properly registered to Cuevas. (*Id.* at 34, ¶ 7.)

23  When Castro pulled into a residential driveway, Bradley initiated a traffic stop. (*Id.* at 35, ¶ 8.)

24  Bradley noticed two passengers in the car, one in the front seat and one in the back seat and

---

[1] The parties largely agree on sequence of events; however, they dispute various details including the parties' knowledge, intent, and level of involvement in these events.

[2] Defendants seemingly dispute Cuevas's awareness of the backpack's contents by stating that the backpack "clearly contained ammunition, a fully loaded ammunition, a fully loaded gun magazine and a crack pipe." (Doc. 87-1 at 4, ¶ 5.) Defendants cite to a picture of the backpack to support their assertion. (*Id.*) This, alone, does not demonstrate that Ms. Cuevas looked in the backpack or was aware of its contents.

2

1    informed dispatch of this information. (*Id.* at 35, ¶ 9.) Castro did not comply with Officer

2    Bradley's signals to remain stopped and drove across the lawns of multiple residences to flee

3    from the traffic stop. (*Id.* at 35, ¶ 11.) Bradley pursued Castro's vehicle and radioed for backup.

4    (*Id.* at 35, ¶ 9.) Sgt. Garcia, Officer Garcia, and Officer Puente responded and joined the pursuit.

5    (*Id.* at 37, ¶ 22.)

6         The high-speed pursuit came to an end when Castro skidded off the roadway and into an

7    embankment next to an open field. (Doc. 85-2 at 4, ¶ 4.) After Castro came to a stop in the mud,

8    he began to rev the engine, causing the tires to spin. (*Id.* at 40, ¶ 35.) Defendants contend that the

9    revving of the engine and spinning of the tires caused Sgt. Garcia to fear that the vehicle would

10   gain traction and Castro would accelerate into Officer Bradley, who was behind the vehicle (*Id.* at

11   7-8, ¶ 6), though the car did not again move from this location during the following events.[3] The

12   officers yelled at Castro to turn off the engine and exit the vehicle, but they did not and the

13   revving of the engine may have made them unable to hear the commands. (Doc. 85-2 at 6, ¶ 5.)

14   Sgt. Garcia decided to break the driver's window with his baton to better communicate with the

15   occupants. (*Id.* at 16-17, ¶ 11; *Id.* at 42, ¶ 50.)

16        After Sgt. Garcia broke the window, Castro stopped revving the car's engine. (Doc. 79-2

17   at 253) During the following 15 to 30 seconds, Officer Garcia gave several warnings that a police

18   dog would be deployed if Castro did not comply. (*Id.*) Officers Puente and Garcia testified that

19   Officer Garcia gave these commands as he approached the car and indicated that he would deploy

20   his police K9, if they did not comply.[4] (Doc. 79-2 at 280, 299.) Officer Garcia testified that after

21   Sgt. Garcia broke the window, he "continued yelling commands, and [he] told the driver that if he

22   did not stop, that I was going to send the dog, and [Officer Garcia] repeatedly said that." (Doc.

23   80-11 at 4) Officer Garcia then inserted his police K9 into the driver's side window. (Doc. 85-2 at

24

25   _____

26   [3] Cuevas contends the spinning of the tires only caused the car to sink deeper into the mud and implying that the car
     *could not* have moved. (*Id*; Doc. 79-2 at 181, 249, 279.) The evidence upon which she relies does not establish that
     the car could not have gained traction and moved forward at some point during the events. Rather, she demonstrates

27   that after the events, the right rear tire was deep in the mud.
     [4] Though the plaintiffs disputed Fact 12, the evidence they cite does not support that Garcia did not give commands.

28   (Doc. 85-2 at 17) Indeed, many of the factual disputes claimed by the plaintiffs are not supported by the evidence
     cited.

17-19, ¶¶ 12-14.) In response, Castro shot the dog at least three times (Doc. 79-5 at 49) and shot Officer Garcia one or two times using a 40-caliber handgun.[5] *Id*. at 29, 49)

Upon seeing Officer Garcia was shot, Sgt. Garcia fired at least 17 times toward the car. (Doc. 85-2 at 21-24, ¶ 16.) The ballistic evidence and expert reports demonstrate that Sgt. Garcia stepped toward the back of and along the length of the car while shooting. (*Id.*) The ballistic evidence suggests that Sgt. Garcia fired through the front and rear driver's side windows, and some shots traveled in the direction of the front passenger. (*Id.*)

Officer Bradley fired several rounds at the vehicle. (Doc. 85-2 at 24-25, ¶ 17.) He testified that he aimed directly toward the driver's location and that he was aiming at the location where he thought the shots from inside the car had originated. (Doc. 79-2 at 185.) Officer Puente also fired several rounds at the vehicle. (Doc. 85-2 at 25, ¶ 18.) Officer Puente testified that he aimed "more towards the driver's side of the vehicle, since that's where I saw the gunshots come from." (Doc. 72-7 at 4)

Though the defendants assert that they all aimed solely at the drivers' side of the car (Doc. 85 at 6), at least two bullets were shot through either the driver's window or through the rear driver's side window in Cuevas' direction. (Doc. 79-5 at 58.) The officers fired a total of 34 rounds into the vehicle. (Doc. 85-2 at 46, ¶ 68.) Afterward, Castro exited the vehicle through the passenger side and fired towards the officers. (*Id.* at 27-29, ¶¶ 20-22.) The officers did not return gunfire, and Castro collapsed shortly after firing his second round. (*Id.*)

Castro died due to his bullet wounds. (Doc. 85-2 at 46, ¶ 68.) Cuevas sustained gunshot wounds to her left shoulder and left chest and to her head. (*Id.*) Cuevas's injuries required multiple surgeries, including a tracheostomy, a thoracotomy, and a pacemaker implantation, and she required a feeding tube for two years. (*Id.* at 53, ¶ 99.) Cuevas continues to suffer from severe left facial and vocal cord paralysis, hearing loss, vision impairment, fainting episodes, and limited mobility; she is permanently disabled and relies on home health services for daily needs. (*Id.*) Ware did not sustain any physical injuries from the incident. (Doc. 82 at 10.) Officers Garcia's

---

[5] Although Cuevas responds to this fact as "disputed," her statements and supporting evidence do not dispute that Castro fired at the dog and Officer Garcia. (Doc. 85-2 at 20, ¶ 15.)

1  injuries ended his career as a police officer, and his K9 partner was killed. (Doc. 17 at 4, ¶ 11;

2  Doc. 72 at 10.)

3  **B.  Procedural Background**

4  On October 27, 2019, Letitia Tuggle, on behalf of herself and on behalf of Castro's estate,

5  Ware, and Cuevas filed a complaint against the City of Tulare, Police Chief Matt Machado, and,

6  as amended, against Sgt. Andy Garcia, Officer Ryan Garcia, Officer Puente, and Officer Bradley.

7  (Doc. 1.) Plaintiffs' claims include violations of the Fourth and Fourteenth Amendments under 42

8  U.S.C. § 1983, including *Monell* claims and supervisory liability claims, and state law claims for

9  wrongful death, negligence, battery, and a Bane Act violation. (*Id.* at 1.) Defendants City of

10  Tulare and Officer Ryan Garcia filed counterclaims against all Plaintiffs for negligence,

11  negligence per se, assault and battery, equitable contribution, and as amended, conversion. (Doc.

12  4.) Following several amended pleadings, the parties' causes of action chiefly remain the same.

13  (Docs. 8, 17, 22, 51.)

14  During litigation, a dispute arose between Tuggle, Ware, and Defendants regarding

15  Tuggle's and Ware's failure to respond to certain discovery requests. (*See* Doc. 57.) The

16  presiding magistrate judge imposed monetary and evidentiary sanctions against Tuggle and Ware.

17  (*Id.* at 37-39.) Ware did not disclose any information in response to Defendants' questions related

18  to his *Monell* claims. (*Id.* at 30-31.) Tuggle's responses to the *Monell*-related requests simply

19  referred to the 2018 officer-involved shooting of Jontell Reedom and conclusory allegations

20  regarding deficiencies in TPD's training policies. (*Id.* at 34-35.) Accordingly, the magistrate

21  judge's evidentiary sanctions preclude Ware from introducing any evidence to support his *Monell*

22  liability claims and prohibit Tuggle from offering *Monell* evidence claims, "beyond reference to

23  an apparent 'Reedom' officer-involved shooting and/or references to Tulare Police policies." (*Id.*

24  at 38.) The magistrate judge specified that if Cuevas introduced *Monell* evidence, it must be

25  subject to a limiting instruction so as to not support Tuggle's or Ware's claims. (*Id.*)

26  Though the cases remain consolidated, Cuevas requested, and the Court granted, leave for

27  her to file an amended complaint, separately from Tuggle and Ware. (Docs. 46, 50, 51.) Cuevas's

28  amended complaint asserts Fourth Amendment, *Monell*, and supervisory claims under § 1983 and

1   state claims for a Bane Act violation, negligence, and assault and battery. (Doc. 51 at 11-21.)

2   Cuevas's claims and Defendants' counterclaims against Cuevas proceed separately from those

3   asserted by and against Tuggle and Ware.

4                    **II.      LEGAL STANDARDS FOR SUMMARY JUDGMENT**

5           Summary judgment is appropriate when there is "no genuine dispute as to any material

6   fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In addition,

7   Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there

8   is no genuine issue of material fact as to a particular claim or portion of that claim. *Id.*; *see also*

9   *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary

10  adjudication that will often fall short of a final determination, even of a single claim…") (internal

11  quotation marks, citation omitted).

12          The "purpose of summary judgment is to pierce the pleadings and to assess the proof in

13  order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith*

14  *Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Summary judgment should be entered

15  "after adequate time for discovery and upon motion, against a party who fails to make a showing

16  sufficient to establish the existence of an element essential to that party's case, and on which that

17  party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

18  The moving party bears the "initial responsibility" of demonstrating the absence of a genuine

19  issue of material fact. *Id.* at 323. An issue of fact is genuine only if there is sufficient evidence for

20  a reasonable fact finder to find for the non-moving party, and a fact is material if it "might affect

21  the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

22  248 (1986); *see also Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987). A

23  party demonstrates summary judgment is appropriate by "informing the district court of the basis

24  of its motion, and identifying those portions of 'the pleadings, depositions, answers to

25  interrogatories, and admissions on file, together with affidavits, if any,' which it believes

26  demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quoting

27  Fed. R. Civ. P. 56(c)).

28          If the moving party meets its initial burden, the burden then shifts to the opposing party to

present specific facts that show genuine issue of a material fact exists. Fed R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586. An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 587. The party must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. *Id.* at 586 n.11; Fed. R. Civ. P. 56(c). Further, the opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated no genuine issue of material fact exists and judgment is appropriate as a matter of law. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). In resolving a motion for summary judgment, the Court can only consider admissible evidence. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). Furthermore, evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr*, 285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

### III.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST TUGGLE'S[6] AND WARE'S CLAIMS

Defendants seek summary judgment on all of Tuggle's and Ware's claims, including their § 1983 claims under the Fourth Amendment for excessive force and related *Monell* liability claim; Tuggle's Fourteenth Amendment claim for violation of Due Process; and Tuggle's state law claims under the Bane Act, and for negligence and battery. (Doc. 72.) Tuggle and Ware

---

[6] For the sake of simplicity, the Court refers to Tuggle's claims as an individual and those in her representative capacity for Castro's estate collectively.

oppose the motion in its entirety. (Doc. 82.)

**A.     Fourth Amendment Claims**

Defendants argue that the officers' use of force did not violate Castro's or Ware's Fourth Amendment rights and even if it did, those rights were not clearly established at the time, entitling the officers to qualified immunity. (Doc. 72 at 12-15, 16-19.) Tuggle and Ware contend that the officers' shooting constitutes excessive force because Officer Garcia unreasonably provoked the situation by inserting the police K9 through the car window. (Doc. 82 at 8-10.) Ware further argues the shooting was unreasonable because he did not pose a threat to safety or otherwise engage in criminal conduct that would warrant the use of deadly force. (*Id.* at 11.)

1.   Legal Standards for the Fourth Amendment

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted); *see also United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) ("For purposes of the Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen."). Claims that law enforcement officers used excessive force, either deadly or non-deadly, during an arrest, investigatory stop, or other seizure of a citizen fall under the Fourth Amendment analysis and its standard of objective reasonableness. *Scott v. Harris*, 550 U.S. 372, 381-83 (2007); *Graham v. Connor*, 490 U.S. 386, 395 (1989). Fourth Amendment claims require a showing that (1) a seizure occurred and (2) excessive force was used to seize the plaintiff. *Scott*, 550 U.S. at 381.

"An excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances." *Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 428 (2017). The excessive force analysis considers "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or

1    motivation." *Graham*, 490 U.S. at 397. The inquiry requires "careful balancing of 'the nature and

2    quality of the intrusion on the individual's Fourth Amendment interests' against the

3    countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S.

4    1, 8 (1985)). Thus, the Court must balance the force used against the need for the use of force.

5    *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997). "Because the excessive force

6    inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw

7    inferences therefrom, [the Ninth Circuit has] held on many occasions that . . . judgment as a

8    matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681

9    F.3d 1127, 1130 (9th Cir. 2012) (internal quotations omitted); *Liston*, 120 F.3d at 976 n.10

10   ("[T]he reasonableness of force used is ordinarily a question of fact for the jury.").

11           1.   Pre-Shooting Conduct according to *Mendez*

12           Tuggle and Ware argue that the officers used excessive force because they "intentionally

13   or recklessly provoke[d] a violent confrontation" by deploying the police K9 into the car. (Doc.

14   82 at 8 (citing *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002)).) They rely on the Ninth

15   Circuit's "provocation rule." *Id.* However, the Supreme Court overruled the Ninth Circuit's

16   provocation rule in *County of Los Angeles v. Mendez*, 581 U.S. 420, 426-32 (2017), explaining

17   that the rule improperly "uses another constitutional violation to manufacture an excessive force

18   claim where one would not otherwise exist." The Court affirmed the *Graham* test and determined

19   that the Fourth Amendment's "objective reasonableness analysis must be conducted separately

20   for each search or seizure that is alleged to be unconstitutional." *Id.* at 428. The provocation rule

21   improperly "conflat[es] excessive force claims with other Fourth Amendment claims" and

22   "permits excessive force claims that cannot succeed on their own terms." *Id.* at 429. Instead,

23   *Mendez* held that the proximate cause standard accounts for the harm inflicted because it allows

24   for the consideration of the "foreseeability or the scope of the risk created by the predicate

25   conduct" so long as there is "some direct relation between the injury asserted and injurious

26   conduct alleged." *Id.* at 432. Even still, the Court noted that, "All we hold today is that once a use

27   of force is deemed reasonable under Graham, it may not be found unreasonable by reference to

28   some separate constitutional violation." *Id.* at 429 fn.*.

The Ninth Circuit has explained that *Mendez* does not preclude a jury from considering "unreasonable police conduct prior to the use of force that foreseeably created the need to use it" as part of the totality of the circumstances in the objective reasonableness assessment. *Winkler v. City of Phoenix*, 849 F. App'x 664, 667 (9th Cir. 2021); *see also Orn v. City of Tacoma*, 949 F.3d 1167, 1176 n.1 (9th Cir. 2020) (noting *Mendez* did not preclude considering whether "a police officer unreasonably places himself in harm's way" to evaluate whether his use of deadly force was excessive in the totality of the circumstances). The evaluation of excessive force still considers whether the officer was "simply responding to a preexisting situation" or whether he "create[d] the very emergency he then resorts to deadly force to resolve." *Nehad v. Browder*, 929 F.3d 1125, 1135 (9th Cir. 2019). On the other hand, a Fourth Amendment violation for excessive force cannot be established "based on merely bad tactics that result in a deadly confrontation that could have been avoided." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1034 (9th Cir. 2018), quoting *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002), overruled on other grounds *County of L.A. v. Mendez*, 581 U.S. 420 (2017)); *see City & Cty of San Francisco v. Sheehan*, 575 U.S. 600, 615 (2015); *Knox v. City of Fresno*, 708 F. App'x 321, 323 (9th Cir. 2017).

The parties' arguments do not analyze Officer Garcia's pre-shooting conduct in the totality of the circumstances. Tuggle's and Ware's reliance on the use of the K9 to render any subsequent conduct by the officers unreasonable, without considering the other facts leading up to the shootout, improperly conflates two alleged Fourth Amendment violations and runs afoul of *Mendez*. (Doc. 82 at 8.) Defendants read *Mendez* too strictly and treat any pre-shooting conduct as irrelevant to the immediate threat Castro posed by firing at the officers. (Doc. 86 at 3.) In accordance with *Mendez* and later Ninth Circuit authority, the Court evaluates Officer Garcia's use of the K9 in the totality of the circumstances that the officers confronted.

### 2. Tuggle's Fourth Amendment Claim

#### a. *Reasonableness of Force*

The Fourth Amendment's objective reasonableness assessment of a particular use of force requires a three-step inquiry. *Glenn v. Wash. Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011). It necessitates evaluation of: (1) the type and amount of force used; (2) the government's

10

countervailing interests in the need to use that force; and (3) a balancing of steps one and two to determine the overall reasonableness under the circumstances. *Id.* In *Graham*, the Supreme Court provided three relevant factors to evaluate the totality of the circumstances facing the officers and their interests in using force: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape. *Graham*, 490 U.S. at 396. The *Graham* factors, however, are not exclusive, and the totality of the circumstances test properly considers "whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (internal quotations and citations omitted).

Under the first factor, Castro posed a threat of serious harm to the officers and the public. (Doc. 72 at 13-14.) He led the police on a high-speed car chase during which he failed to stop at stop signs and red lights and swerved into oncoming traffic. (Doc. 86-1 at 3, ¶ 3.) Reckless driving endangers members of the public on the roadways and the police officers pursuing the vehicle. *See Plumhoff*, 572 U.S. at 776-77 (holding the officers did not act unreasonably when firing fifteen rounds to end a high-speed chase where the driver exceeded one hundred miles per hour and caused several other vehicles to alter course because the driver's "outrageously reckless driving posed a grave public safety risk"). The Court agrees that Castro's flight constituted felony evading arrest, which is prohibited by California Vehicle Code § 2800.2. (Doc. 72 at 14.) Most seriously, Castro presented an imminent threat of physical harm by shooting the K9 and Officer Garcia when the officers attempted to place him under arrest. These acts, in isolation, suffice to justify the responding use of deadly force by officers to subdue Castro.[7] *See Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 n.2 (9th Cir. 2014) (affirming summary judgment in favor of an officer who fired at a suspect that he perceived to be exchanging gunfire with another officer); *c.f.*

---

[7] Without doubt, when the officers shot at the vehicle, this constituted deadly force. *Seidner v. de Vries*, 39 F.4th 591, 596 (9th Cir. 2022) ("[S]hooting a firearm . . . by definition is 'deadly force': force that 'creates a substantial risk of causing death or serious bodily injury.'" (quoting *Smith v. City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005))). Officers may use deadly force "only if 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Orn*, 949 F.3d at 1174 (quoting *Garner*, 471 U.S. at 11). A suspect may pose a threat of serious physical harm "if 'there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm,' or if the suspect threatens the officer or others with a weapon capable of inflicting such harm." *Id.* (quoting *Garner*, 471 U.S. at 11).

1  *Corrales v. Impastato*, 650 F. App'x 540, 541-42 (9th Cir. 2016) (holding no excessive force

2  where the officer shot, without warning, the suspect as he rushed towards the officer "while

3  pulling his previously concealed hand from his waistband" and attempting to scare the officer into

4  believing he had a gun).

5        Although the facts immediately prior to the officers' use of deadly force shows their

6  conduct was reasonable as a matter of law, the totality of the circumstances includes the officers'

7  actions that foreseeably created the need to use deadly force. *Winkler*, 849 F. App'x at 667. The

8  totality of the circumstances test requires the Court to evaluate the circumstances surrounding the

9  K9 deployment within the broader context of the events leading up to that use of force. *Hung Lam*

10  *v. City of San Jose*, 869 F.3d 1077, 1087 (9th Cir. 2017). Therefore, the Court must also consider

11  whether Officer Garcia's decision to insert the K9 into the vehicle to subdue Castro constitutes

12  "unreasonable police conduct prior to the use of [deadly] force that foreseeably created the need

13  to use it." *See Winkler* at 667.

14        As noted above, Castro had engaged in very dangerous conduct and was refusing to

15  comply with obvious efforts of the police to stop the car and cause the driver to submit to arrest.

16  Nevertheless, once the car stopped, Castro revved the engine and spun the tires after the car

17  became mired in the mud. Even though he stopped doing revving the engine and spinning the

18  tires after Sgt. Garcia broke the car window[8] (Doc. 86-1 at 4, ¶ 8; Doc. 79-2 at 253), there is no

19  evidence that Castro attempted to submit to the officers' authority despite the warnings given to

20  him and the obvious efforts of the police to stop him. Garcia and Puente testified that before and

21  after the window was broken, Officer Garcia warned the occupants of the vehicle before the

22  window was broken that he would deploy the K9, if they did not surrender. (Doc. 79-2 at 280,

23  299[9] ) Bradley testified also that he heard the other officers yelling at the vehicle's occupants but,

24  

25  ─────────────────
   [8] Some gap in time occurred between when Sgt. Garcia broke the window and when Officer Garcia assisted his K9
   into the vehicle. (Doc. 79-2 at 280 (Officer Garcia testified approximately fifteen to thirty seconds lapsed); *id.* at 299
26  (Officer Puente testified that five to fifteen seconds lapsed)).
   [9]Sgt. Garcia did not recall hearing these commands. (*Id.* at 251) Notably, he testified that he broke the window to
27  make sure the occupants of the car could hear the officers' commands. (Doc. 79-2 at 250-51.) However, this does not
   dispute that the warnings were given, only that not everyone heard the commands. However, in light of the factual
28  circumstances, the fact that the officers wanted Castro to stop the car and submit to arrest cannot be reasonably
   questioned.

due to his focus on the vehicle, he did not hear the words the officers used. (Doc. 80-7 at 5). Though police may not release a police dog on a person who neither endangers officers nor resists arrest, *Penaloza v. City of Rialto*, 836 F. App'x 547, 549 (9th Cir. 2020), the totality of Castro's actions during the police pursuit, when viewed in a light most favorable to him, demonstrate a reasonable basis for Officer Garcia to have believed the threat to safety persisted despite the temporary pause in Castro revving his engine.

On the other hand, retained expert, Ernest Burwell, opines that releasing the K9 in the way Officer Garcia did was an unreasonable use of force[10]. (Doc. 79-4 at 7) He bases his opinion on the fact that there were other occupants in the vehicle. *Id.* However, he does not address the evidence from Officer Garcia that the K9 was "trained to apprehend . . . what he's focused on when I give that command, and the driver was the closest - -the closest suspect he can take old of." (Doc. 80-11 at 6) Officer Garcia testified that he put the dog through the car window and "when I noticed he was fixated on the driver, I gave the command to take hold of him." (Doc. 79-2 at 283)

Indeed, Mr. Burwell does not suggest that putting a K9 into a vehicle under these circumstances was prohibited by POST standards but only that those who do it should have "an advanced amount of training and a high prey-driven dog," which he did not think that Officer Garcia or the K9 had. He does not explain how the lack of this advanced training bore on the force used by Officer Garcia, however. At most, Mr. Burwell concludes that Officer Garcia should have deployed the dog from a position of cover. Though this could have prevented Officer Garcia from being shot, it fails to explain exactly how Officer Garcia inserting the dog into the car caused the damages claimed or constituted an excessive use of force.

To the contrary[11], the Ninth Circuit has stressed that the "severity of the crimes of driving

---

[10] He opines also that Officer Garcia displayed "Tombstone courage" by approaching the vehicle so closely, though he fails to explain how this contributed to any of the harms that the plaintiffs allege that they suffered.

[11] There are of myriad of cases from across the country in which courts have found that using police K9s to remove a driver from their vehicle after a high-speed chase is proper. For example, in *Mortensbak v. Butler*, 102 F. Supp. 3d 1085, 1096 (D.S.D. 2015), the court found constitutional deploying a police K-9 into the cab of a pickup, in which the driver, passenger and a dog were riding, after the driver lead police on a high-speed chase through neighborhoods and appeared to be trying to get the pickup moving again. The court determined the failure to give a warning that the K9 would be deployed in the circumstances was lawful. *Id.* The court held, "These offenses are serious and would

13

at high speeds through residential areas cannot be understated" and reasoned that the driver "posed an immediate, serious threat to officers and others." *Skystad v. Reynolds*, 248 F. App'x 808, 811 (9th Cir. 2007). When affirming a grant of summary judgment in *Skystad*, the Court found no excessive force where the officer deployed a police K9 when the driver of a vehicle who "only minutes before" was "involved in a prolonged and dangerous high-speed chase through residential areas."

During his flight, Castro drove recklessly through a neighborhood, including driving onto and across residents' front yards to attempt to evade the police. (Doc. 72-10 at 12-13.) He sped through stop signs and stop lights during a time of heavy traffic (Doc. 79-2 at 135, 178), drove at high speeds through residential areas and repeatedly swerved into oncoming traffic. (*Id.* at 4, 12-13.) Even after the car became stuck, Castro continued his attempt to flee by revving the engine and spinning the tires. Though he stopped this action in the seconds before Officer Ryan inserted the dog into the car (Doc. 86-1 at 3-4, ¶¶ 4-6.), there is no indication that Castro ever turned the car's engine off. Castro's conduct was highly dangerous and constituted serious risks to public safety and would have led a reasonable officer to believe that he would not submit to peaceful arrest. Consequently, the Court finds that using the K9 to attempt to subdue Castro was not unreasonable as a matter of law.

Moreover, though the evidence shows that people sometimes will try to fight the K9 off by striking the dog, there is no evidence to suggest that it was reasonably foreseeable that in response to deploying the K9, Castro would escalate the situation by drawing a handgun and shooting Officer Garcia and the dog. In addition, considering that Castro fired his handgun nearly at the instant the dog was inserted into the vehicle, causes the Court to conclude that a reasonable jury would not find the officers' use of deadly force in response was unreasonable.

### b.   *Clearly Established Law*

---

have led a reasonable officer to infer at the time that [the driver] would not succumb to apprehension peacefully and was willing to put officers and the public in danger in order to avoid arrest." *Id.*  In *McAllister v. Dean*, No. 4:13-CV-2492 CEJ, 2015 WL 4647913, at *8 (E.D. Mo. Aug. 5, 2015), the court held similarly that after a high-speed chase, using a K9 to extract a driver from a vehicle was proper. Again, in *Ashford v. Raby*, 951 F.3d 798, 803 (6th Cir. 2020), the court held that using a police K9 to remove a driver from his vehicle did not violate clearly established law.

1   Even if the use of the K9 was unreasonable, the Court finds that the defendants are

2   entitled to qualified immunity because their use of force did not violate clearly established law.

3   (Doc. 72 at 16.) Qualified immunity is "immunity from suit rather than a mere defense to

4   liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The doctrine "balances two important

5   interests—the need to hold public officials accountable when they exercise power irresponsibly

6   and the need to shield officials from harassment, distraction, and liability when they perform their

7   duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Qualified immunity attaches

8   when an official's conduct does not violate clearly established statutory or constitutional rights of

9   which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79 (2017).

10  Qualified immunity may apply regardless of whether the officer makes "a mistake of law, a

11  mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at

12  231. A qualified immunity defense has two prongs: (1) viewing the facts favorable to the plaintiff,

13  whether the officers violated a constitutional right; and (2) whether that right was "clearly

14  established" at the time of the violation. *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017). Thus,

15  even assuming the officers' violated Castro's Fourth Amendment right under the first prong,

16  qualified immunity may shield them from liability if clearly established law did not sufficiently

17  define the contours of the right at the time the violation occurred. *Saucier v. Katz*, 533 U.S. 194,

18  202 (2001).

19  To be "clearly established," a rule must be "dictated by controlling authority or by a

20  robust consensus of cases of persuasive authority." *District of Columbia v. Wesby*, 138 S. Ct. 577,

21  589-90 (2018); *see also Evans v. Skolnik*, 997 F.3d 1060, 1066 (9th Cir. 2021) (noting that Ninth

22  Circuit precedent is sufficient to meet the "clearly established" prong of qualified immunity). The

23  proper inquiry focuses on whether "it would be clear to a reasonable officer that his conduct was

24  unlawful in the situation he confronted," *Saucier*, 533 U.S. at 202, or "whether the state of the

25  law [at the relevant time] gave 'fair warning' to the officials that their conduct was

26  unconstitutional." *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (quoting *Hope v. Pelzer*,

27  536 U.S. 730, 740 (2002)).

28  Courts must define the law to a "high degree of specificity." *Wesby*, 138 S. Ct. at 590.

1    The dispositive question is "whether the violative nature of *particular* conduct is clearly

2    established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (emphasis in original). "While there does

3    not have to be a case directly on point, existing precedent must place the lawfulness of the

4    particular action beyond debate." *City of Escondido v. Emmons*, 139 S. Ct. 500, 504 (2019)

5    (internal quotations omitted). Because the inquiry requires consideration of the context of the

6    particular factual circumstances, material disputes of fact often preclude application of qualified

7    immunity at summary judgment. *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 953 (9th Cir.

8    2000) ("The determination of whether a reasonable officer could have believed his conduct was

9    lawful is a determination of law that can be decided on summary judgment only if the material

10   facts are undisputed."). The Court must frame the question of the clearly established right

11   construing the facts most favorable to the plaintiff. *Morales*, 873 F.3d at 826.

12         Even if a reasonable jury could find the officers used excessive force, the parties have not

13   cited, and the Court has not found "a case where an officer acting under similar circumstances

14   was held to have violated the Fourth Amendment." *See Emmons*, 139 S. Ct. at 504 (internal

15   quotations omitted). The available caselaw, including, *Skystad* discussed above, render the

16   officers' actions debatably lawful. *See id.* As mentioned, in *Skystad*, the officer's actions did not

17   constitute excessive force where the officer deployed a police K9 on the driver of a vehicle who,

18   minutes before, had engaged in a prolonged and dangerous high-speed chase through residential

19   areas. 248 F. App'x at 811 (9th Cir. 2007). Moreover, a recent case from the Ninth Circuit held

20   that K9 deployment into a vehicle to apprehend a suspect that had demonstrated a risk to public

21   safety and who refused to submit to arrest for an extended period does not violate clearly

22   established law as of 2016. *See Hernandez v. Town*, 989 F.3d 739, 742-46 (9th Cir. 2021)

23   (holding the law did not clearly establish an excessive force violation where police attempted for

24   many minutes to remove a drunk driver from his stopped vehicle without success and then

25   released a K9 into the car to force the suspect to submit to arrest). Considering *Skystad* and

26   *Hernandez* and the other cited authorities, and without any factually similar case to the contrary, a

27   reasonable officer would not have had fair warning that using the K9 in the manner used in this

28   case (i.e., the attempted extraction from a vehicle of a suspect who had posed a risk to public

1  safety by recklessly driving during a high-speed chase) was unlawful.

2        On the other hand, the use of the K9 is to be considered among the many factors and

3  circumstances that the officers confronted. Critically, Castro reacted to the K9 deployment by

4  immediately firing his handgun at the K9 and Officer Garcia, rather than defending himself with

5  less forceful means and, in doing so, created an imminent and severe threat to the officers' safety.

6  (Doc. 86-1 at 7, ¶ 15.) Clearly established law permits the officers to use deadly force in response

7  to Castro's gunfire by discharging their police firearms. *See Cruz*, 765 F.3d at 1079 n.2; *Corrales*,

8  650 F. App'x at 541-42. Thus, whether viewing the K9 deployment in isolation or as part of the

9  totality of the circumstances with the subsequent use of deadly force, established precedent does

10  not sufficiently determine that the officers' actions constituted excessive force. Thus, the Court

11  finds Defendants did not violate a clearly established right by deploying the K9[12] or by

12  discharging their firearms at Castro. Accordingly, Defendants' motion for summary judgment as

13  to Tuggle's Fourth Amendment claim is **GRANTED**.

14        3.  Ware's Fourth Amendment Claim

15        In addition to their arguments made related to Tuggle's Fourth Amendment claim,

16  Defendants raise several arguments to support their request for summary judgment on Ware's

17  claim. They contend that Ware was not "seized" and cite *Brower v. City of Inyo*, 489 U.S. 593,

18  596 (1989), for the proposition that Ware was not the object of the officers' intended use of force.

19  (Doc. 72 at 14 n.5.) Defendants assert that the officers did not direct deadly force at Ware, and he

20  "was never struck by any gunshots." (Doc. 86 at 4.) Their briefing related to whether Ware was

21  "seized" within the meaning of the Fourth Amendment does not provide further legal or factual

22  support, but they refer to similar arguments made in their separate motion for summary judgment

23  against Cuevas's claims. (Doc. 72 at 14 n.5.) In response, Ware provides sparse analysis of the

24  seizure issue. He argues that he reasonably did not feel free to leave when the officers "fired their

---

[12] Because the Court determines that there was no excessive force and, even if there were, qualified immunity applies, the Court refers to the officers collectively. However, there is no evidence that any of the officers knew that Officer Ryan was intending to insert the K9 into the car when he did. Castro fired his gun immediately as the dog went in. There was insufficient time for the other officers to intercede, should they have felt that use of the K9 was unlawful. Thus, the Court finds that even if the use of the K9 was excessive, the other officers cannot be held liable for this use of force.

1    guns in his direction" and that when "a traffic stop occurs the passenger is also seized." (Doc. 82

2    at 10-11 (citing *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) and

3    *Brendlin v. California*, 551 U.S. 249, 255 (2007)).)

4         Because the arguments about whether the passengers were intended objects of the

5    officers' force and whether their application of force amounts to a "seizure" under the Fourth

6    Amendment is better developed in the motion regarding Cuevas's claims, the Court addresses

7    those issues below. The Court incorporates that analysis with respect to Cuevas as equally

8    applicable to Ware because they occupied similar roles in the incident as mere passengers in the

9    vehicle.[13] As discussed more fully with respect to Cuevas's claims, insufficient evidence exists to

10   conclude that the officers intended to seize anyone in the vehicle besides the driver, and even if

11   they did, clearly established law at the time of the incident would not have put the officers on

12   notice that their use of force was excessive, entitling them to qualified immunity. Accordingly,

13   Defendants' motion for summary judgment on Ware's Fourth Amendment claim is **GRANTED**.

14   **B.     Fourteenth Amendment Claim**

15        Defendants also seek summary judgment on Tuggle's Fourteenth Amendment claim for

16   violation of the Due Process Clause for the deprivation of Castro's life. "Police conduct violates

17   due process if it 'shocks the conscience.'" *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th

18   Cir. 2013) (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)). Typically, a plaintiff

19   may satisfy the "shocks the conscience" standard by showing the officers acted with either

20   "deliberate indifference" or a "purpose to harm . . . unrelated to legitimate law enforcement

21   objectives." *Porter*, 546 F.3d at 1137. "However, in circumstances where an officer cannot

22   practically deliberate, such as where 'a law enforcement officer makes a snap judgment because

23   of an escalating situation, his conduct may only be found to shock the conscience if he acts with a

24   purpose to harm unrelated to legitimate law enforcement objectives.'" *A.D.*, 712 F.3d at 453

25

26   [13] Like Cuevas, Ware argues that the officers' force was excessive because they may not use "deadly force where the suspect poses no 'immediate threat to the officer or others.'" (Doc. 82 at 11 (citing *Garner*, 471 U.S. at 11).) Ware

27   contends he was unarmed, had not committed any crime, did not pose an immediate threat of death or serious bodily injury, and was not resisting or trying to escape. (*Id.*) Ware, like Cuevas, fails to provide authority suggesting the

28   officers were not entitled to respond to Castro's use of deadly force with deadly force directed at Castro because the car contained passengers.

(quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)). "'Deliberation' for the purposes of the shocks the conscience test is not so literal a concept;" even when an officer logically *could* deliberate, the circumstances may necessitate split-second decision making which requires the heightened purpose to harm standard. *Porter*, 546 F.3d at 1139-40 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 851 n.11 (1998)); *Onossian v. Block*, 175 F.3d 1169, 1171 (9th Cir. 1999).

Tuggle argues that the deliberate indifference standard applies because "a jury could conclude that Defendant Garcia deliberated on deploying his K-9 in a manner that provoked a deadly shootout" resulting in Castro's death. (Doc. 82 at 9-10.) Defendants maintain the heightened "purpose to harm" standard applies because "all officers were quickly reacting with a series of split-second decisions to a situation continuously escalated by Castro with virtually no time to deliberate." (Doc. 72 at 16.)

Cases involving high-speed police pursuits routinely apply the "purpose to harm" standard because they involve fast paced and quickly evolving circumstances. *See Lewis*, 523 U.S. at 854; *see also Onossian*, 175 F.3d at 1171-72 (explaining a high-speed car chase, that resulted in a car accident with an innocent third-party, required "split-second" decision making and the purpose to harm standard applied). The Ninth Circuit has distinguished between emergency situations, to which the heightened standard applies, and non-emergency situations, for which deliberate indifference suffices. *Porter*, 546 F.3d at 1139. "[H]igh speed chases are inherently emergency situations." *Id.*

Arguably, the K9 deployment and shootout occurred after the high-speed chase had ended. Nonetheless, the rapidly evolving sequence of events after Castro's vehicle became stuck on the embankment still necessitate application of the purpose to harm standard. *See Porter*, 546 F.3d at 1134-35, 1139 (holding plaintiff must show purpose to harm for the officer's firing at a driver after a five-minute altercation between decedent and the officer that involved yelling, confusion, and the driver refusing to exit or stop his car). Castro continued to spin the tires and rev the engine in attempts to escape even after the car become mired in the mud. (Doc. 86-1 at 3, ¶ 5.) Even if Castro terminated his attempted flight after Sgt. Garcia broke the window, only five to thirty seconds passed before Officer Garcia deployed the K9. (*Id.* at 5, ¶ 10.) The emergency

19

and "life-threatening situation" had ceased, if at all, for mere seconds. *Moreland v. Las Vegas Metro. Police Dept.*, 159 F.3d 365, 372 (9th Cir. 1998); *see also Fletes v. City of San Diego*, No. 13-cv-2279 JAH(JMA), 2015 WL 13326240, at *8 (S.D. Cal. Sep. 30, 2015), *aff'd* 687 F. App'x 640 (9th Cir. 2017) (applying heightened "purpose to harm" standard where police shot at a vehicle after a police pursuit because the officers decided to fire their weapons within "mere seconds" after the driver accelerated towards an officer). The imminence of Castro's reckless driving and attempted flight presented safety risk about which the officers did not have ample time to deliberate. *See Gonzalez*, 747 F.3d at 792-93, 797 (requiring a purpose to harm standard where, during a traffic stop, a serious of non-violent interactions occurred but the driver refused to comply with officer instructions and the officer shot the driver less than ten seconds after the car started accelerating as to flee the scene). The Court concludes the heightened "purpose to harm" standard applies in these circumstances.

Tuggle seems to concede that her Fourteenth Amendment claim cannot succeed under this heightened standard because she makes no argument that the officers had a purpose to harm Castro unrelated to legitimate law enforcement objectives. (*See* Doc. 82 at 9-10.) Even if she did not intend to concede this argument, there is no evidence that any officer acted with such intent given that it is undisputed all officers used force for the purpose of arresting Castro. Arresting individuals that pose a serious safety risk to officers or the public is a legitimate law enforcement objective. *See A.D.*, 712 F.3d at 454. Accordingly, Tuggle's Fourth Amendment claim fails as a matter of law, and Defendants' motion for summary judgment as to this claim is **GRANTED**.

## C.   *Monell* Claims

Defendants seek to dismiss Tuggle's and Ware's *Monell* claims against the City of Tulare and Interim Chief of Police Machado. (Doc. 72 at 9-20.) Section 1983 permits a cause of action directly against local governments and municipalities; however, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 691 (1978) (emphasis in original). Instead, § 1983 holds municipalities liable only when an "action pursuant to official municipal policy of some nature caused a constitutional tort."

*Id.* "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original).

For claims that a municipality failed to preserve constitutional rights, a plaintiff establishes *Monell* liability by showing: "(1) she was deprived of a constitutional right; (2) the County had a policy; (3) the policy amounted to a deliberate indifference to her constitutional right; and (4) the policy was the moving force behind the constitutional violation." *Mabe v. San Bernardino City., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001) (internal quotations omitted). The existence of a municipal policy may be shown through several ways including: an express policy, *Monell*, 436 U.S. at 690; a longstanding practice or custom, *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005); an unwritten decision by a final policymaker with decision-making authority, *McMillian v. Monroe Cnty.*, 520 U.S. 781, 785 (1997); ratification by an authorized policymaker, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); and failure to train, discipline, or hire, *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Defendants argue that Tuggle's and Ware's *Monell* claims must fail because they suffered no constitutional violation, and the City cannot be held liable in the absence of the officers' individual liability. (Doc. 72 at 19.) *Monell* liability first requires that the plaintiff was deprived of constitutional right. *Mabe*, 237 F.3d at 1110-11. Thus, municipal liability does not exist if "the officer inflicted no constitutional harm." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Demarest v. City of Vallejo*, 44 F.4th 1209, 1226 (9th Cir. 2022) ("Because [plaintiff] has failed to show that he suffered any underlying constitutional violation, [the] ninth cause of action, asserting municipal liability for such violations, necessarily fails."). However, a grant of qualified immunity does not shield municipalities from liability because it *presumes* a constitutional violation. *Owen v. City of Indep.*, 445 U.S. 622, 657 (1980). Consequently, when officers are entitled to qualified immunity, the municipality may nonetheless be liable, if the remaining *Monell* elements are met. *Horton v. City of Santa Maria*, 915 F.3d 592, 603-04 (9th Cir. 2019) ("[A] municipality may be liable if an individual officer is exonerated on the basis of the defense

1    of qualified immunity, because even if an officer is entitled to immunity a constitutional violation

2    might still have occurred." (quoting *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1186 n.7 (9th Cir.

3    2002), *overruled on other grounds* by *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir.

4    2016))); *Chew*, 27 F.3d at 1438 ("Supervisorial liability may be imposed under section 1983

5    notwithstanding the exoneration of the officer whose actions are the immediate or precipitating

6    cause of the constitutional injury.").

7         However, here, the Court has determined that the officers did not use excessive force as a

8    matter of law in the context of Tuggle's claims and Castro's actions. In addition, the Court

9    concluded that even if there were a constitutional violation, the law was not clearly established at

10   the time, which entitled the officers to qualified immunity from Tuggle's Fourth Amendment

11   claim. Consequently, Tuggle and Ware's *Monell* claims fail.

12        Even if the Court found a constitutional violation, the Defendants argue the *Monell* claims

13   fails because Tuggle and Ware have insufficient evidence to support their claim. (Doc. 72 at 19-

14   20.) In opposing the motion for summary judgment, Tuggle and Ware present evidence that the

15   magistrate judge ordered could not be used as an evidentiary sanction for their failure to comply

16   with their discovery obligations. For example, they rely upon Sgt. Hastings' deposition testimony,

17   Interim Chief Machado's deposition testimony, and internal affairs investigation reports that were

18   produced during discovery as a result of Cuevas's efforts to litigate her claims. (Doc. 82 at 13.)

19   The magistrate judge determined that evidence supporting Cuevas's *Monell* claims is subject to a

20   limiting instruction and cannot support Tuggle's and Ware's claims. (Doc. 57 at 37-38.)

21   Accordingly, the Court disregards this evidence with respect to the motion against them.

22        Tuggle and Ware may only rely on information in the amended complaint. (Doc. 57 at 37-

23   38.) The amended complaint broadly alleges that Interim Chief Machado, as the final

24   policymaker for TPD, implemented policies "that have led to the lack of, or inadequacy, of

25   training for Tulare officers in the use of force in the field and how to effect an arrest of a suspect."

26   (Doc. 22 at 6, ¶ 28.) It concludes that the City of Tulare violated Plaintiffs' constitutional rights

27   by "not training, or inadequately training its officers on how to deal with effecting an arrest." (*Id.*

28   at 7-8, ¶ 35.) The remaining allegations simply recite the elements of *Monell* liability claims for

widespread custom or practice and ratification. (*See id.*; *see also id.* at 9, ¶¶ 41-42 (Fourteenth Amendment claim).)

Regarding the failure to train allegations, they do not sufficiently identify a particular deficiency in the training protocols. *See Connick*, 563 U.S. at 62 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."); *see also Mitchell v. Cnty. of Contra Costa*, 600 F. Supp. 3d 1018, 1032 (N.D. Cal. 2022) (dismissing *Monell* claim that lacked allegations "about the specific training that was deficient or how it was deficient" or "how the training deficiencies results in the alleged constitutional violations at issue"). The allegations that TPD's training program was inadequate in the officers' "use of force in the field and how to effect an arrest of a suspect" are too general to demonstrate how "policy makers are on actual or constructive notice" that their protocols cause "employees to violate citizens' constitutional rights." *Connick*, 563 U.S. at 61.

To the extent Tuggle and Ware rely on a widespread practice or custom theory, they cannot point to a single violation to demonstrate a permanent or well-settled municipal policy. *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents."). They have not presented any evidence beyond the single incident giving rise to their own claims to illustrate an established municipal policy. Similarly, their formulaic recitation of elements for a ratification theory lacks any factual evidence to support their claim. *See AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012); *see also Acevedo v. City of Farmersville*, No. 1:18-cv-01747-LJO-SAB, 2019 WL 3003996, at *12 (E.D. Cal. July 10, 2019) (dismissing *Monell* claim where complaint contained only "a conclusory recitation of the elements of a *Monell* claim"). Because Tuggle and Ware may not rely on Cuevas's *Monell* evidence produced in discovery and their amended complaint fails to provide sufficient evidence to establish *Monell* liability,[14] the Court **GRANTS**

---

[14] Although Tuggle may also rely on the "reference to an apparent 'Reedom' officer-involved shooting and/or references to Tulare Police policies," these references provide no more than vague references to deficient training policies and reference to a sporadic incident that gives no indication of the similarity of those incidents to the officers' use of force in this case. *See Raudelunas v. City of Vallejo*, No. 2:21-cv-00394-KJM-JDP, 2022 WL

1   Defendants' motion for summary judgment on Tuggle's and Ware's *Monell* claims.

2            **IV.**     **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

3                          **AGAINST CUEVAS'S CLAIMS**

4       Defendants seek summary judgment on Cuevas's claims for relief, including her § 1983

5   claims for violation of the Fourth Amendment,[15] *Monell* liability, and supervisory liability; and

6   her state law claims for violation of the Bane Act, negligence, and assault and battery. (Doc. 73.)

7   Cuevas opposes the motion in its entirety. (Doc. 79.)

8   **A.**     **Fourth Amendment Excessive Force Claim**

9       Defendants argue summary judgment is warranted because Cuevas was not "seized" as a

10   matter of law under the Fourth Amendment and because the officers are entitled to qualified

11   immunity. (Doc. 73 at 13-18.) Cuevas maintains she suffered a constitutional seizure and that

12   clearly established law prevents qualified immunity from shielding the officers from liability.

13   (Doc. 79 at 21-28.)

14        1.   <u>Whether Cuevas was "Seized"</u>

15       Defendants argue that Cuevas lacks standing[16] to assert a Fourth Amendment claim

16   because she was not the "object" of the officers' intended seizure. (Doc. 73 at 13-15.) Cuevas

17   contends she was seized because she experienced the same restrictions of movement as Castro

18   and because she reasonably believed she was not "free to leave, particularly at the conclusion of a

19   high-speed chase while surrounded by four officers with their guns drawn and aimed at the

20   sedan." (Doc. 79 at 21-24.)

21       Under the Fourth Amendment, a person is seized when a governmental actor terminates

22

23

---

24   329200, at *8 (E.D. Cal. Feb. 3, 2022) ("[R]epeated constitutional violations must be substantially similar in character to establish a Monell claim.").

25   [15] Cuevas's second amended complaint lists the First, Fourth, and Fourteenth Amendments among the allegations; however, her specific claims for relief appear directed at the Fourth Amendment. (Doc. 51 at 10, ¶ 35.) The parties focus their briefing and arguments on the Fourth Amendment standards. Accordingly, the Court limits its discussion

26   of Cuevas's § 1983 claim to the Fourth Amendment.

27   [16] Although phrased as "standing," Defendants argument concerns a substantive element of a Fourth Amendment claim—whether the plaintiff's injuries occurred from a "seizure" by a governmental actor. *Villanueva*, 986 F.3d at 1165 n.5 ("The term Fourth Amendment standing is 'a useful shorthand for capturing the idea that a person must

28   have a cognizable Fourth Amendment interest' to bring a Fourth Amendment claim, 'but it should not be confused with Article III standing, which is jurisdictional.'" (quoting *Byrd v. United States*, 138 S. Ct. 1518, 1512 (2018))).

her freedom of movement "through means intentionally applied." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989) (emphasis omitted). Freedom of movement is terminated when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Even if an individual does not feel free to leave, a constitutional seizure occurs only when the individual is the "object" of the officer's intentionally applied force. *Brower*, 489 U.S. at 596; *Arruda ex rel. Arruda v. Cnty. of L.A.*, 373 F. App'x 798, 799 (9th Cir. 2010). The Fourth Amendment does not encompass "the accidental effects of otherwise lawful government conduct." *Brower*, 489 U.S. at 596. Nonetheless, a seizure may still occur "even when an unintended person or thing is the object of the detention or taking." *Id.* For example, when an officer mistakes the identity of a suspect but intentionally applies force to restrict the mistaken victim's freedom, a seizure occurs. *See Jensen v. City of Oxnard*, 145 F.3d 1078, 1082-83 (9th Cir. 1998) (holding an officer seized his fellow officer by firing three rounds from his shotgun because the firing officer mistook his fellow officer as an occupant of the premises for which the SWAT team was executing a search warrant).

However, an officer's bullet that accidentally strikes a bystander does not constitute a seizure when the officer aimed at a different suspect. *United States v. Lockett*, 919 F.2d 585, 590 n. 4 (9th Cir. 1990); *see also Lopez v. Santa Maria*, No. CV13-7287 AJW, 2016 WL 316004, at **3-5 (C.D. Cal. 2016) (finding the officer did not seize a fellow officer when he aimed at the suspect, but his shot hit the fellow officer that entered the line of fire). For instance, when police inadvertently shoot a hostage in a vehicle while aiming at a known suspect, they do not seize the hostage with their intentionally fired but inaccurately aimed bullet. *See Arruda*, 373 F. App'x at 799 (citing *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 795 (1st Cir. 1990)). On the other hand, when officers intentionally target a group of people indiscriminately, a seizure occurs for any individual that suffers injury from the officer's force. *Nelson v. City of Davis*, 685 F.3d 867, 876-77 (9th Cir. 2012). Similarly, officers executing a traffic stop on a vehicle seizes both the driver and the passengers by stopping the vehicle's movement. *Brendlin v. California*, 551 U.S. 249, 254-57 (2007)).

To support a conclusion that Cuevas was "seized" under the Fourth Amendment, she primarily focuses her arguments and cited authority on the officers' actions in stopping the vehicle in which she was a passenger. (Doc. 79 at 21-24.) Viewing the facts most favorable to Cuevas, the car stopped when it became stuck on the mud embankment because Castro skidded off the roadway. (Doc. 85-2 at 4, ¶ 4.) As Castro continued to spin the tires and rev the engine, Cuevas raised her hands demonstrating that she submitted to the authority of the officers in their attempts to restrict the vehicle's movement. (Doc. 85-2 at 40, ¶¶ 35, 37.) Under *Brendlin*, Cuevas seems to argue that she was seized Cuevas as part of the intentionally applied force and show of authority to stop and detain the vehicle. *Brendlin*, 551 U.S. at 254-57. However, the evidence does not support that Castro stopped the car based upon these considerations, but that the car stopped despite his desire to continue to flee when it struck the embankment. Even still, if Castro had stopped the car in submission to the officers' actions or authority, this stop was plainly lawful because Castro had led them on a high-speed car chase and committed several dangerous traffic violations during the pursuit. (Doc. 85-2 at 2-3, ¶ 3[17]); *see also Scott v. Harris*, 550 U.S. 372, 386 (2007) ("A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death."); *c.f. United States v. Willis*, 431 F.3d 709, 716 (9th Cir. 2005) (holding the officers had reasonable suspicion to stop a driver for his having made an illegal U-turn). Cuevas does not contend that the officers' initial actions in detaining the vehicle, before deploying the police K9 and subsequent shootout, constituted an unreasonable seizure.

Regarding the officers' conduct following the initial stop, Cuevas argues that she was seized by the officers' "intentional gunshots into the car." (Doc. 79 at 23-24.) She relies on, *Villanueva v. California*, 986 F.3d 1158 (9th Cir. 2021), to argue that when "officers fired shots at the driver of a vehicle following a pursuit, killing the driver and injuring the passenger," the

---

[17] In the statement of facts, Cuevas does not expressly admit that Castro committed traffic violations during the high-speed chase, but she does not dispute that he drove at "excessive speeds and through stop signs and red lights," and that Cuevas was "terrified" during the pursuit that they would be in a "bad car accident." (Doc. 85-2 at 37, ¶¶ 19-20.)

1    passenger is also seized by those gunshots. (*Id.*) In *Villanueva*, the Ninth Circuit held that a

2    passenger injured by officers who shot at a vehicle while attempting to stop the vehicle from

3    escaping have a cognizable Fourth Amendment claim. *Villanueva* at 1165. The Ninth Circuit

4    explained that whether officers knew passengers were in the vehicle was irrelevant because the

5    injured passenger was the "subject to the Officers' 'intentional action to stop the car'—and with it

6    the 'objectively manifested' restraint on his movement—whether the Officers knew he was a

7    passenger when they fired or not." *Id.* at 1167 (quoting *Brendlin*, 551 U.S. at 260). Critically,

8    however, the officers in *Villanueva* shot at the vehicle "with the intent of stopping the Silverado

9    from moving, effecting a traffic stop by force" and seizing all occupants of the car in the process.

10   *Id.*

11        In this case, the officers shot at the vehicle not to stop it—it had already stopped when it

12   skidded into the mud embankment—and after Castro had stopped his attempts to escape the

13   police.[18] Then, Officer Bradley, Sgt. Garcia, and Officer Puente discharged their weapons in

14   response to Castro shooting Officer Garcia and the K9. (Doc. 85-2 at 20-26, ¶¶ 16-18.) Even

15   assuming the officers did not know precisely *who* was firing, the evidence shows they directed

16   their shots at the shooter, whom they believed to be the driver, and not at the car in general. (Doc.

17   79-2 at 185 (Officer Bradley testified that he aimed at the driver's side and driver's seat area.); *id.*

18   at 254, 256 (Sgt. Garcia testified that he shot into the driver's area and while shooting, he focused

19   on addressing the threat posed by the driver.); *id.* at 300 (Officer Puente testified that he "was

20   aiming more towards the driver's side of the vehicle, since that's where [he] saw the gunshots

21   come from.").)

22        In contrast to *Villanueva*, instances where the police shoot at a vehicle to neutralize a

23   safety threat posed by the driver, the officers do not intentionally seize the accidently injured

24   passengers. For example, in *M.J.L.H. V. City of Pasadena*, police pursued a murder suspect as he

25   attempted to flee in his vehicle, initiating a police pursuit. No. CV 18-3249-JFW(SSx), 2019 WL

26

27   _____

     [18] Although the parties dispute whether Castro continued to rev the engine and spin the tires after Sgt. Garcia broke
     the window, neither party asserts that Castro attempted to flee after Officer Garcia inserted Bane through the
28   window. At this point, the undisputed facts show that Castro pulled out his handgun and fired at Officer Garcia and
     the K9. (Doc. 85-2 at 20, ¶ 15.) Then, the officers returned fire towards the vehicle. (*Id.* at 20-26, ¶¶ 16-18.)

2249545, at *2 (C.D. Cal. May 24, 2019). During the chase, police observed the suspect reach toward the middle console area as if reaching for a gun. *Id.* Officers shot at the vehicle to prevent the suspect from continuing his escape and from potentially using "his car as a weapon" to flee towards an area occupied by a fellow police officer. *Id.* After multiple shots fired by police, the suspect's car finally stopped. *Id.* The officers then discovered that a passenger in the vehicle had also been shot. *Id.* at 3. The *M.J.L.H.* court concluded the defendants had not intentionally shot at the passenger. *Id.* at 9-10.

Similarly, in *Fletes*, the police pursued a car after the driver failed to pull over following a traffic violation. 2015 WL 13326240, at **1-2. When the pursuit ended, officers surrounded the car, and the driver began revving the engine, driving forward and backward, threatening the lives of the officers surrounding the vehicle. *Id.* Officers fired thirty rounds at the car, fearing the driver would run over one of the officers. *Id.* The district court held, and the Ninth Circuit affirmed, that officers had not intended to seize a passenger injured in a shootout because the "officers unequivocally testified that the driver of the car—and not [the passenger]—was the intended object of their shots." *Fletes*, 687 F. App'x at 641. Likewise, here, the officers all testified that they aimed their weapons towards the driver's side in response to the shots fired by Castro. The undisputed facts show that the officers did not shoot at the vehicle to stop it from further movement because the car had already stopped. Thus, under *Fletes* and *M.J.L.H.*, Cuevas was not seized under the Fourth Amendment.

2.   <u>Whether Cuevas Was Seized under Clearly Established Law</u>

Even if a jury could find Cuevas was seized, the Court concludes that available authorities support a grant of qualified immunity because they demonstrate the occurrence of a seizure in Cuevas's circumstances was not clearly defined.

Cuevas relies on *Brendlin*, *Villanueva*, and *Nelson* to argue that when the officers stopped the vehicle and "when they shot into it, both the driver and the passengers were seized." (Doc. 79 at 27.) She contends that *Villanueva* stands for the proposition that as of 2016 "'a passenger struck by a stray bullet aimed at the vehicle or driver has a cognizable Fourth Amendment claim.'" (*Id.* (quoting *Villanueva*, 986 F.3d at 1167).) Cuevas's cited portion of the rule from

1    *Villanueva* omits an important qualifier: the Court limited its holding to "these circumstances."

2    *Villanueva*, 986 F.3d at 1167. As described above, the circumstances of *Villanueva* differ in

3    critical respects including that the officers shot at the vehicle to stop it from further movement,

4    rendering the officers' action akin to a traditional traffic stop which, under *Brendlin*, constitutes a

5    seizure on all occupants of the vehicle. *Id.* at 1166-67 (citing *Brendlin*, 551 U.S. at 255 ("[D]uring

6    a traffic stop an officer seizes everyone in the vehicle, not just the driver")). *Villanueva* does not

7    determine that passengers suffer a Fourth Amendment seizure when officers shoot into a vehicle

8    that has already stopped.

9            *Nelson* also fails to provide sufficiently similar factual circumstances. In *Nelson*, the

10   officers received orders to disperse a crowd of college students at a party. 685 F.3d at 874. The

11   officers launched pepperballs into the confined crowd without aiming at any particular person. *Id.*

12   874-75. Because the plaintiff was a member of the group at which officers intentionally fired their

13   weapons and was struck by that force, "he and his fellow students were the undifferentiated

14   objects of shots intentionally fired by the officers in the direction of that group." *Id.* at 876-77. In

15   contrast, the officers testified that they aimed at the driver's side of Cuevas's vehicle, intending to

16   strike and subdue the individual who had shot at them. Because the officers shot at the vehicle to

17   in response to the threat posed by Castro rather than shooting at the car as a whole, the evidence

18   does not permit the inference that Cuevas was an undifferentiated object of the officers'

19   intentionally applied force. The factual distinctions, in *Brendlin*, *Villanueva*, and *Nelson*, prevent

20   them from clearly establishing that Cuevas suffered a Fourth Amendment seizure. *White v. Pauly*,

21   580 U.S. 73, 79 (2017) ("[T]he clearly established law must be particularized to the facts of the

22   case." (Internal quotations omitted).

23           Moreover, at a minimum, the outcome of *Fletes* renders the officers' actions debatably

24   lawful. *See Emmons*, 139 S. Ct. at 504. In *Fletes*, the Ninth Circuit held that the passenger was

25   not seized when the officers fired thirty rounds of shots at the vehicle to stop the driver from

26   using his vehicle as a weapon to potentially harm the officers surrounding the car, even though

27   one of the bullets struck the passenger. 687 Fed App'x at 641; *Fletes*, 2015 WL 13326240, at *2.

28   These circumstances more similarly compare to the safety threat that Castro posed to officers and

1   to the officers' response of firing thirty-four rounds at the vehicle to neutralize that threat. (Doc.

2   85-2 at 46, ¶ 68.) The situations differ insofar as, in *Fletes*, the officers all testified they were

3   unaware of the presence of the passenger until after the shooting; whereas, some evidence

4   suggests the officers knew Castro had two passengers in the vehicle prior to the shootout.[19]

5   Nonetheless, the *Fletes* holding, at the very least, demonstrates that whether seizure occurs when

6   officers shoot at a vehicle containing passengers in response to an imminent safety threat posed

7   by the driver is not yet clearly defined.

8           3.   Whether the Officers Used Excessive Force on Cuevas

9          Even if she was seized under the Fourth Amendment, to establish a constitutional

10   violation, Cuevas must show that the officers' actions in effecting the seizure amounted to

11   excessive force under clearly established law. *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th

12   Cir. 1991) ("The plaintiff bears the burden of proof that the right allegedly violated was clearly

13   established at the time of the alleged misconduct."). Defendants assert they are entitled to

14   qualified immunity because the violation of Cuevas's constitutional rights was not clearly

15   established at the time of the violation. (Doc. 73 at 15-18.)

16          Cuevas argues that the officers used excessive force by inserting the K9 into the driver's

17   window and by shooting "indiscriminately into the car that they knew, or must have known,

18   contained innocent passengers." (Doc. 79 at 24-26.) Cuevas maintains that she posed no threat to

19   the officers' safety, had not committed any crime, and sat in the passenger seat with her hands

20   raised when the shootout began. (*Id.*) To the extent Cuevas argues that the officers' actions were

21   excessive in the context of *Castro's* conduct, the Court has already determined that the officers

22   are entitled to judgment, as discussed previously in reference to Tuggle's Fourth Amendment

23   claim. Thus, because the Court has concluded that the officers' use of force was not excessive

24   underly clearly established law, the remaining issue for Cuevas's claims turns on whether, and to

25

26   _____

27   [19] The proffered testimony is unclear about whether all responding officers heard Officer Bradley informing dispatch that the vehicle contained three people. (Doc. 85-2 at 9-11, ¶ 8.) Officer Garcia testified that he heard the information, but Sgt. Garcia and Officer Puente could not confirm that they had heard it. (*Id.*; Doc. 79-2 at 244, 276, 297.) However, Defendants do not dispute that all responding officers had been listening to Officer Bradley's conversations with the dispatcher. (Doc. 85-2 at 37, ¶ 22.)

28

1    what extent, the officers were required to temper their response because they knew or should have

2    known passengers were in the vehicle and under the totality of the circumstances they confronted.

3          In *Boyd v. Benton County*, the Ninth Circuit explained that the presence of innocent

4    bystanders and the risk of harm to those bystanders by the officer's chosen means of force may be

5    relevant to the totality of the circumstances analysis. 374 F.3d 773, 779 (9th Cir. 2004) (holding a

6    jury could find the officer's use of force objectively unreasonable where they deployed a flash-

7    bang device into an apartment, occupied by approximately eight people, of which only two were

8    the suspects of the officers' warrant for arrest). Relying on *Boyd*, several courts have considered

9    "whether innocent bystanders may be injured in addition to the targets of force" in the *Graham*

10   analysis. *Xiong v. Chavez*, No. 1:13-CV-00083-SKO, 2016 WL 345609, at *5 (E.D. Cal. Jan. 28,

11   2016); *see also Bailey v. County of San Joaquin*, 671 F.Supp.2d 1167, 1174 (E.D. Cal. 2009);

12   *Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972, 990 (D. Ariz. 2012).

13         When officers apply force on a crowd of people, some courts seem to draw a distinction

14   between the nonviolent actions of the plaintiff and the threats posed by people surrounding the

15   plaintiff. *See Sanderlin v. City of San Jose*, No. 20-CV-04824-BLF, 2023 WL 2562400, at *12

16   (N.D. Cal. Mar. 16, 2023) (denying qualified immunity to officers who struck the plaintiffs with a

17   projectile shot while trying to disperse a protest because "[the plaintiffs] were not engaged in any

18   violence towards the police, although others around them may have been"); *see also Nichols v.*

19   *City of Vallejo*, No. 2:12–cv–02564–KJM–AC, 2014 WL 127999, at *7 (E.D. Cal. Jan. 14, 2014)

20   (finding officers' actions not objectively reasonable as a matter of law, although ultimately

21   entitled to qualified immunity, where the officers pushed the plaintiff who was part of a crowd

22   surrounding a traffic stop because even though some people were yelling profanities at the

23   officers, "there is no indication plaintiff was shouting or otherwise acting unruly"). However,

24   none of these cases involved circumstances where the suspect posed an imminent and deadly

25   threat to the officers' safety, which necessarily requires them to engage in split-second decision

26   making. *See Barnes v. City of Pasadena*, No.: 10–CV–00470–JHN–PJWx, 2011 WL 13143536,

27   at *8 (C.D. Cal. May 5, 2011); *c.f. Williamson v. Edgley*, No. 4:19-CV-00099-BLW, 2020 WL

28   6531010, at *8 (D. Idaho Nov. 4, 2020) (explaining that whether the officers' used excessive

1    force on a known, innocent passenger in the vehicle when attempting to detain the suspect driver

2    turns on whether the *driver* posed a direct threat to the officers).

3           Most importantly, the Court has not found, and Cuevas has not cited any authority that

4    clearly establishes the unlawfulness of the officers' use of deadly force responsive to Castro's

5    shooting Officer Garcia and the police K9, by firing thirty-four rounds into the still-running

6    vehicle, which had just been involved in a high-speed chase, even if the officers knew innocent

7    passengers were in the car. Cuevas cites to, *Estate of Aguirre v. Cnty. of Riverside*, 29 F.4th 624,

8    629 (9th Cir. 2022), for the proposition that officers cannot use deadly force where "the suspect

9    poses no immediate threat to the officer and no threat to others." (Doc. 79 at 28.) Cuevas's

10   contends that, like in *Aguirre*, she did not pose an immediate threat to the officers. (*Id.*) Cuevas's

11   comparison to *Aguirre* improperly defines the constitutional right at too high a level of generality

12   and fails to account for several pertinent factors including: that she was shot in the firefight

13   occurring in response to Castro shooting Officer Garcia and the K9; Cuevas sat in the passenger

14   seat of the car from which shots emanated; and Castro drove recklessly while leading led officers

15   on a high-speed pursuit and attempted to flee even after his initial stop in the embankment. In

16   contrast, the circumstances of *Aguirre* involved the police shooting a man who had a stick and

17   then retrieved a baseball bat while officers pointed their guns at him. *Aguirre*, 29 F.4th at 626. In

18   some instances, a "general constitutional rule," such as prohibiting officers from using deadly

19   force on a suspect posing no immediate threat to safety, may apply with "obvious clarity" (*see*

20   Doc. 79 at 28 (internal quotations omitted)); however, the factual distinctions between *Aguirre*

21   and this case are too great to have informed the officers that their conduct was unlawful.

22          In contrast, the *Fletes* case suggests otherwise. *See Emmons*, 139 S. Ct. at 504. In *Fletes*,

23   as discussed above, the Ninth Circuit determined there is no constitutional violation when the

24   officers by shooting thirty rounds at a vehicle after a high-speed pursuit, and where the driver

25   accelerated toward one of the officers. 2015 WL 13326240, at \*\*1-2; *Fletes*, 687 Fed App'x at

26   641. Even though the officers in *Fletes* were unaware of the presence of the passenger, no other

27   case law exists to suggest that under circumstances like those here, that it was a violation of the

28   Fourth Amendment to respond with deadly force to the driver's use of deadly force *because of* the

1    presence of passengers. Because a case with sufficiently similar facts does not exist, the officers

2    did not have a "fair warning" that their use of force as applied to Cuevas was unreasonable. *See*

3    *Hope*, 536 U.S. at 739-40. Thus, the Court finds the officers are entitled to qualified immunity.

4    Accordingly, Defendants' motion for summary judgment on Cuevas's Fourth Amendment claim

5    is **GRANTED**.

6    **B.    Monell Claims**

7         As discussed previously with respect to Tuggle's and Ware's *Monell* claims, no municipal

8    or supervisory liability can exist in the absence of an underlying constitutional violation. *Heller*,

9    475 U.S. at 799. Because Cuevas did not suffer a Fourth Amendment "seizure," no constitutional

10   violation occurred. Accordingly, the Court **GRANTS** Defendants' motion for summary judgment

11   against Cuevas's claims arising under *Monell* and supervisory liability.

12                          **V.    CONCLUSION AND ORDER**

13        As set forth above, the Court **GRANTS** summary judgment on all Plaintiffs' federal

14   claims. Because no federal claims remain, the Court declines to exercise supplemental

15   jurisdiction on the remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3). *Ove v. Gwinn*,

16   264 F.3d 817, 826 (9th Cir. 2001); *Novac v. Cnty. of Sacramento*, No. 218CV02232JAMKJN,

17   2019 WL 5309540, at *5 (E.D. Cal. Oct. 21, 2019) (quoting 28 U.S.C. § 1367(c)(3), ("A district

18   court may sua sponte decline to exercise supplemental jurisdiction over pendant state law claims

19   if it 'has dismissed all claims over which it has original jurisdiction.'") Thus, Plaintiffs' state law

20   claims and the counterclaims asserted by City of Tulare and Officer Ryan Garcia are

21   **DISMISSED without prejudice**. Because the counterclaims are dismissed without prejudice, the

22   Court **DENIES as moot** Cuevas's motion for summary judgment (Doc. 74.) For the reasons

23   stated above, the Court **ORDERS**:

24        1.    Defendants' motion for summary judgment against Tuggle's and Ware's claims

25              (Doc. 72) is **GRANTED**.

26        2.    Defendants' motion for summary judgment against Cuevas's claims (Doc. 73) is

27              **GRANTED**.

28        3.    Cuevas's motion for summary judgment against City of Tulare's and Officer Ryan

Garcia's counterclaims (Doc. 74) is **DENIED as moot**.

4.     All state law claims and counterclaims are **DISMISSED without prejudice**.

5.     The clerk of court is directed to enter judgment in favor of Defendants.

6.     The clerk of court is directed to close this case.

IT IS SO ORDERED.

Dated:   **June 29, 2023**

UNITED STATES DISTRICT JUDGE

34